Mark Stephen Smith, State Bar No. 158734
**THE COMMUNITY LAW GROUP, LLC**
444 West Ocean Boulevard, Suite 800
Long Beach, California 90802
Telephone:  (562) 437-3326
Facsimile:  (562) 684-4311
Email:  thecommunitylawgroup@gmail.com

Attorneys for Plaintiffs DON SPENCER, individually and
as Administrator of the Estate of JEREMY SPENCER;
RACHAEL SPENCER, an individual; DRENEA SINGER,
an individual

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DISTRICT

| | |
|---|---|
| DON SPENCER, individually and as Administrator of the Estate of JEREMY SPENCER; RACHAEL SPENCER, an individual; DRENEA SINGER, an individual,<br><br>        Plaintiffs,<br><br>    vs.<br><br>COUNTY OF LOS ANGELES, a Municipal Entity, DEPUTY STEVEN AMENT; DEPUTY ROBERT GARAY; and DOES, 3-30,<br><br>        Defendants. | Case No.:  2:19-CV-00808-AB (PLAx)<br><br>**Honorable Judge Andre Birotte, Jr.**<br><br>**EVIDENCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[Filed Concurrently with Plaintiffs' Opposition to Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment and Response to Defendants' Separate Statement of Undisputed Material Facts and Conclusions of Law]**<br><br>**Date:**    December 18, 2020<br>**Time:**    10:00 am.<br>**Dept.:**   10A<br><br>**Action Filed:**    February 4, 2019<br>**Trial Date:**      August 3, 2021 |

1
2
3     Plaintiffs DON SPENCER, individually and as Administrator of the ESTATE
4  OF JEREMY SPENCER, RACHAEL SPENCER, and DRENEA SINGER provides the
5  following index of evidence presented in opposition to Defendants' Motion for
6  Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment:
7
8                              **INDEX OF EVIDENCE**
9  **Exhibit 1:**    West Los Angeles Veteran's Administration Medical/Psychiatric
10                    records of Jeremy Spencer
11 **Exhibit 2:**    April 4, 2020 Report of Dr. Kevin E. Booker, South Bay Forensics &
12                    Behavioral Medicine
13 **Exhibit 3:**    Police Report/Witness Statements
14 **Exhibit 4:**    April 24, 2018 Investigative Memorandum of Michael D. Howard &
15                    Associates
16 **Exhibit 5:**    December 12, 2019 Marvin Pietruszka, M.D. Pathology Report - Final
17                    Anatomic Diagnoses/Clinical Diagnoses
18 **Exhibit 6:**    County of Los Angeles Department of Medical Examiner/Coroner
19                    Autopsy Report
20 **Exhibit 7:**    Central Counties Services Mental Health Records for Rachael E.
21                    Spencer
22 **Exhibit 8:**    Report of Kephart Consulting, LLC, Plaintiffs' retained Police Practices
23                    Expert
24 **Exhibit 9:**    April 21, 2020 Christopoulos Economics Consulting Group's Summary
25                    of Economic Damages Claimed by the Family of Jeremy Spencer
26     Dated:  November 26, 2020.
27                                    Respectfully submitted,
28                                    **THE COMMUNITY LAW GROUP, LLC**

---
EVIDENCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT
*Spencer, et al. v. County of Los Angeles, et al. – USDC Case No. 2:19-CV-00808-AB-PLA*

1

2

By: _____

3    MARK STEPHEN SMITH, ESQ.

4    Attorneys for Plaintiffs DON SPENCER,

5    individually and as Administrator of the Estate

     of JEREMY SPENCER; RACHAEL SPENCER;

6    and DRENEA SINGER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-------------------------------------------------------------------------------------
EVIDENCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT
*Spencer, et al. v. County of Los Angeles, et al.* – USDC Case No. 2:19-CV-00808-AB-PLA

1  MARK STEPHEN SMITH SBN 158734
2  THE COMMUNITY LAW GROUP LLC
   444 W. OCEAN BLVD. SUITE 800
3  LONG BEACH, CA. 90802
   (562) 437-3326 Telephone
4  (562) 684-4311 Facsimile
   Thecommunitylawgroup@gmail.com
5
6  Attorney for Plaintiffs Don Spencer, individually
   and as Administrator of the Estate of Jeremy Spencer,
7  Rachael Spencer, an individual and Drenea Singer,
   an individual.
8

9                    UNITED STATES DISTRICT COURT

10        CENTRAL DISTRICT OF CALIFORNIA- CENTRAL DISTRICT

11

12

13  DON SPENCER, individually and as          )  Case Number: BP159108
    Administrator of the Estate of JEREMY      )
14  SPENCER; RACHAEL SPENCER, an               )  DECLARATION OF MARK STEPHEN
    individual; DRENEA SINGER, an individual,  )  SMITH IN SUPPORT OF EXHIBITS
15                                             )
16           Plaintiffs                        )
                                               )
17       vs.                                   )
                                               )
18                                             )
                                               )
19  COUNTY OF LOS ANGELES, a Municipal         )
    Entity, DEPUTY STEVEN AMENT; DEPUTY
20  ROBERT GARAY; and Does, 3-30,
21           Defendants.
22  _____

23

24       I, Mark Stephen Smith, declare as follows;
25
    DECLARATION OF MARK STEPHEN SMITH IN SUPPORT OF EXHIBITS IN SUPPORT
26  OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT.
27            Spencer v The County of Los Angeles, Et Al,
28            USDC Case No. 2:19-CV-00808-AB-PLA

1. That I am the attorney for the Plaintiffs in the aforementioned case.

2. That I do hereby submit the exhibits 1-9 in support of the Plaintiff's opposition to motion for Summary Judgement.

3. That the exhibits were generated in preparation for this case and were provided to the Defendants during the course of discovery.

4. That I submit that everything contained in these exhibits are true, correct and accurate, based on my knowledge and belief

I declare under penalty of perjury of the laws of the United States of America, that the above stated is true and correct; executed this 26th day of November, 2020 in Long Beach, California

Respectfully submitted,

Mark Stephen Smith, Esq.

Attorney for Plaintiffs.

**DECLARATION OF MARK STEPHEN SMITH IN SUPPORT OF EXHIBITS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT.**

**Spencer v The County of Los Angeles, Et Al,**

**USDC Case No. 2:19-CV-00808-AB-PLA**

# EXHIBIT 1

# Consult Requests

MSA SUPV: Please schedule pt. for MHC Intake on next available date.

ADDED COMMENT        12/30/13 09:51      JOHNSON,DETRA L        JOHNSON,DETRA L
A discreet message to contact the va sepulveda

SCHEDULED          12/30/13 10:01      LUNA,GINA A           JOHNSON,DETRA L
SEP-MHC SCREENING Consult Appt. on 01/07/14 @ 14:00
new consult patient d/date 1/7 (DJ)

INCOMPLETE RPT      01/07/14 14:35      KOSTEN,FARIAL A        KOSTEN,FARIAL A
    Note# 39017764
COMPLETE/UPDATE     01/07/14 16:15      KOSTEN,FARIAL A        KOSTEN,FARIAL A
    Note# 39017764

Note: TIME ZONE is local if not indicated

--------------------------------------------------------------------------

LOCAL TITLE: MENTAL HEALTH INITIAL ASSESSMENT-CONSULT
STANDARD TITLE: MENTAL HEALTH CONSULT
DATE OF NOTE: JAN 07, 2014@13:55     ENTRY DATE: JAN 07, 2014@13:55:53
    AUTHOR: KOSTEN,FARIAL A      EXP COSIGNER:
    URGENCY:                     STATUS: COMPLETED

Age: 43  GENDER: MALE    RACE: RACE UNKNOWN
MARITAL STATUS:  Married.


                         CLINICAL HISTORY


PRESENTING CHIEF COMPLAINT:
Referred by PCP.


HISTORY OF CURRENT ILLNESS:
This is a male who patient who is 60% Rated Disabilities: LIMITED FLEXION OF
KNEE (0%-SC) LIMITED MOTION OF ARM (10%-SC), VERTEBRAL FRACTURE OR DISLOCATION
(20%-SC), LIMITED MOTION OF ARM (10%-SC), POST-TRAUMATIC STRESS DISORDER (30%-
SC), TINNITUS (10%-SC), SCARS (0%-SC), NEURALGIA OF SUPERFICIAL PERONEAL NERVE
(0%-SC), HYPERTENSIVE VASCULAR DISEASE (0%-SC), SEPTUM, NASAL, DEVIATION OF (0%-
SC), LIMITED FLEXION OF KNEE (10%-SC)

- Patient reports being forgetful (misplacing keys, forgetting wallet),
having angry outbursts over minimal problems, my mood can become easily
"irritable and condescending", is irritated by traffic.  He sleeps 6-7 hours,
but waking up throughout the night. He reports that his angry reactions are
upsetting to him. He also reports being easily startled by loud noises and
avoiding crowds and/or public functions.

---

**PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)**  |  **VISTA Electronic Medical Documentation**

SPENCER,JEREMY D

Printed at WEST LA VAMC

# Consult Requests

```
ASSESSMENT OF VIOLENCE RISK FACTORS:
--------------------------------------
VIOLENCE RISK FACTORS CHECKLIST:
Patient is considered low risk for violence given no history of violence and
denial of homicidal ideation/intention/plan.


                    INITIAL DSM-5 DIAGNOSIS:
Clinical Disorder: PTSD
Personality Disorders/Traits: Deferred
Current Medical Condition:  see medical history above
Current Psychosocial Stressors: none


ASSESSMENT:
This is a 43 year old patient who is casually dressed and exhibited good eye
contact and a pleasant demeanor. Patient endorses forgetfulness, having
angry outbursts, and disrupted sleep. He also reports being easily startled by
loud noises and avoiding crowds and/or public functions.

He denies auditory and visual hallucinations, however, reports paranoid ideation
without psychosis and being a recluse.

He denied symptoms of depression, mania, anxiety, panic attacks, psychosis,
auditory/ visual hallucinations, suicidal/ homicidal ideation.

In light of the above, patient diagnosed with PTSD.

PLAN:
- Discussed dx and TX with patient.
- Referred to Vet Center in Palmdale which is close to his residence.
- Patient counseled on decreasing his large quantity of caffeine intake.
- Referred to Dr. Fitten for medication evaluation.
- Discussed the importance of diet and nutrition; sleep and relaxation, physical
exercise and positive social interactions in the maintenance of physical and
mental health.

#MEDICAL
-Encouraged patient to follow-up with his primary care physician for treatment
of any medical issues.

#LEGAL
-Patient does not meet criteria for LPS 5150 for involuntary hospitalization
at this time as he is not a DTS/DTO or GD.

-Pt. aware of urgent and emergent care options including SACC walk in,
911, and local ER and WLA ER.

RTC: Medication follow up to be determined by Dr. Fitten.
```

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| SPENCER TEDE | Printed at WEST LA VAMC |

# EXHIBIT 2

# South Bay Ψ Trauma Consultants
### Confidential Information Do Not Distribute

*Jeremy Spencer*
*Report Date: April 04, 2020*
*Re: Case#: 2:19 CV00808 ABPLA*

*Examiner: Dr. Kevin E. Booker*
*South Bay Forensics & Behavioral Medicine*
*18039 S. Crenshaw Bl, Torrance, CA 90504*

## WARNING OF LIMITS OF CONFIDENTIALITY

Prior to conducting my interview of family members, I reported to the client that the my review/evaluation of treatment records was to assist in the determination of the personal, psycho-social, psychiatric and environmental factors that may have been present at the time Mr. Jeremy Spencer was killed. I informed the client that the information in my reports would be revealed to their designated legal counsel in the form of a written report and in that sense, will not be confidential. I clearly informed the clients that they could refuse to participate in the interview, but I would still be providing a report to counsel (based upon my clinical observations, impressions and other, collateral sources of information I may review relative to this case). Client stated, "Yes" to my confidentiality disclaimer and appeared to adequately understand the warning.

## CIRCUMSTANCES OF REFERRAL

Jeremy Spencer was a 48-year-old man involved in an altercation with Los Angeles Sheriff's Department on 02/03/18 which resulted in his death. This clinical opinion is provided in relation to his psychiatric and mental health history based on an exhaustive review of medical-psychiatric records, military records and collateral interviews with three members of his nuclear family to include: Mr. Don Spencer (father), Mrs. Drenea Singer (daughter) and Mrs. Rachael Spencer (wife).

## Records Reviewed:

**United States District Court-Central District Civil Complaint**
**Declaration Stanley L. Kephart dated**
**Los Angeles County Sheriff's Department Report dated 02/03/18**
**Don Spencer Interview dated 02/05/18**
**South Bay Trauma Forensic Interview of Rachael Spencer-Dr. Booker**
**South Bay Trauma Forensic Interview of Don Spencer-Dr. Booker**
**South Bay Trauma Forensic Interview of Drenea Singer-Dr. Booker**
**Department of Mental Health Mets Report, dated 01/05/18; 01/30/18**
**Medical Records Antelope Valley Hospital dated 12-4-14**
**Veterans Affairs Hospital Medical Records 163 (pages)**

# South Bay Ψ Trauma Consultants
### Confidential Information Do Not Distribute

*Jeremy Spencer*
*Report Date: April 04, 2020*
*Re: Case#:* **2:19 CV00808 ABPLA**

*Examiner: Dr. Kevin E. Booker*
*South Bay Forensics & Behavioral Medicine*
*18039 S. Crenshaw Bl, Torrance, CA 90504*

constructive contributions to society in his, life however after being deployed to Iraq he experienced chronic, Post-traumatic Stress Disorder with pronounced anxiety and paranoia. It is noteworthy that as he discussed his emotionally traumatic combat experiences with medical providers at the VA Hospital beginning in approximately 2011, Jeremy consistently displayed anxiety, worry and avoidance related to his exposure to combat trauma in Iraq. Moreover, clinical data from this medical-psychological record evaluation suggests that for several years prior to his death, Jeremy was apparently suffering from the chronic condition of Post-traumatic Stress Disorder, secondary to his exposure to combat-related violence in Iraq. Jeremy reported to VA doctors that in 2004 he was exposed to enemy attacks (e.g., mortars, IEDs, rocket propelled grenades and other weaponry) in Abugarub. As such, he subsequently developed chronic avoidance, re-experiencing and hypervigilance-all of which represent the hallmark symptoms of military-related PTSD. It is evident from his family member's reports as well as review of medical records/VA Disability evaluation in August, 2011 that the impact of these clinical symptoms- 1) Intrusive reminders 2) Bothersome thoughts 3) Low, depressed/negative mood 4) Emotional numbing and 5) Hyperarousal and hypervigilance likely mitigated against Jeremy's , *executive decision-making at times.* This is often observed in PTSD-impairment. Moreover, patients who suffer from the negative, emotionally dysregulating effects of intrusive, hurtful, fear-inducing, "noxious" memories of their traumatic experiences will often make special efforts to avoid these negative thoughts and emotions/memories by psychically "pushing away "(suppressing) these thoughts, isolating themselves and often engaging mood-altering activities (i.e., psychoactive substances) in an effort to induce mental states of avoidance (i.e., psychic numbing). In fact, Jeremy was ultimately prescribed psychiatric medication in the interest of helping to control his symptoms. Although it is documented that he was frequently paranoid and afraid to leave his home and, even on one occasion threatened his neighbors, my medical opinion is such that his erratic actions were mitigated by PTSD-related hypervigilance and a thought disorder consistent with Schizophrenia Spectrum Disorder.

# EXHIBIT 3

018 - 02285 - 1197 - 058

January 30, 2018 Tuesday 9:45 AM James Hougen walking south with Brat (black part pit bull0 on a leash, very unusual, and carrying a long metal stick, he is shouting back at Jeremy Spencer, "I'm going to fuck you up! Over and over. Donna is shouting at James to "Get out of here!" over and over. James kept turning around and starting to walk back. Don Hougen is at Donna's also and I can hear him shouting something to Jeremy but I cannot hear the words.

10:42 AM Jeremy Spencer is shouting again. I can hear several people at the basketball hoop.

February 1, 2018  Thursday

9:15 AM  Jeremy Spencer shouting at someone. I could not discern what was going on. Before I could get to the front door and open it to listen his shouting stopped.

9:30 AM Jeremy shouting again. Donna Hougen shouting back. She began clanging her front yard pipes. I could hear James Hougen or Don Hougen in the background but could not hear what they were shouting.

2:18 PM  Jeremy Spencer shouting "I'm going to keep going until you guys pay me. I won the bet! I won the game and you guys gotta pay me!"

3:05 PM  James and Jeremy shouting. James sing foul "fucking" over and over again Jeremy threatening "I'll blow you up!"

Donna and Tanya go to the mail box.

3:30 PM  The Sherriff patrol car arrives at Jeremy's just after Donna Hougen drives James away. The Sherriff helicopter arrived and began circling over Jeremy's house.

3:40 PM  Over the PA system "This is the Los Angeles County Sherriff. We would like you to come out of your house please."

4:03 PM I called the Lancaster station of the Sherriff Department. I told the woman at the desk what was happening here. I said, "You need to call Jeremy Spencer's father in Hawthorn. Jeremy is mentally ill, he has PTSD, he's a veteran. The Hougen's next door have been taunting him all day." I gave the officer all three address' *Mina 40174, Hougen* 40184, 176 th St E of Jeremy, 40192.

4:32 PM The helicopter left. Donna Hougen and others congregated at Corona's house. They are laughing and joking as though it is a party.

4:54 PM The group is still standing in front of Corona's house and laughing and talking. Three patrol cars just pulled away to the south. Shortly afterward everyone left.

DEF COLA CONFIDENTIAL 00161

018 - 02285 - 1197 - 058

5:08 PM James Hougen just walked past my place, grey sleeveless tee shirt and long dark shorts. He was going to Donna Hougen's I believe. Later he came back South as I sat in my living room watching TV It was dark. He shouted back towards Donna's house. Have a fuckin good day Mom!

CONFIDENTIAL
THIS MATERIAL IS SUBJECT TO THE
ATTORNEY-CLIENT AND/OR THE
ATTORNEY WORK PRODUCT PRIVILEGES

# EXHIBIT 4

MICHAEL D. HOWARD & ASSOCIATES CA P.I. LIC. NO. 21573
500 West Graham Ave # 926, Lake Elsinore CA 92530
PHONE (951) 234-1282/ E-mail michaelhowardus@mail.com
www.mdhowardpi.com
Bonded & Insured

## INVESTIGATIVE MEMORANDUM

**DATE:**     APRIL 24, 2018

**TO:**     MARK STEPHEN SMITH ATTORNEY AT LAW

**CC:**     MARVIN PIETRUSZKA, M.D., J.D.

**CASE:**     Jeremy Spencer Wrongful Death Case Interviews Sheriff Case No  018-
02285-1197-058 Coroner's Case No. 2018-01088

**FROM:**     MICHAEL D. HOWARD & ASSOCIATES

**RE:**     PRELIMINARY INTERVIEW NOTE SUMMARY

On April 15th 2018 I went to the home, 40192 176th Street East Palmdale CA 93951, of decedent Jeremy Spencer. While there I took extensive photos of location and interviewed 3 witnesses at the location.

Of the three  and 3 people I interviewed confirm in brief the following:

1. Deputies handcuffed Jeremy at his hands and feet.
2. That the handcuffs on his feet were over his clothing.
3. Witness 3 states that Jeremy was being hogtied with strapping from his hand cuffs on his hands to the ones on his angel area/legs.
4. Jeremy was tasered and hit by deputies according to Witnesses 2 as well as hit by deputies with fists and flashlights.
5. Witness 3 states that he saw upon his arrival deputies pinning Jeremy with their knees into his head and neck area and back. Stating they also was hitting him in the same locations of his body.
6. Witness 3 said Jeremy was at one point was not struggling with deputies though they continued to hit Jeremy.
7. Each of the 3 people I interviewed said they clearly heard Jeremy tell deputies they were hurting him.
8. Shortly there after according to each of the 3 witnesses I interviewed Jeremy became still at which point deputies started un tied Jeremy and began to began to give some form of medical aide. Witnesses 1 and 2 described it as CPR.

Also I attempted to interview residents, adults male and female, on the north side of victim Spencer residence. Victim Spencer died in his rear yard. A The residence of these persons is 40206 176th Street East, Palmdale CA 93591. A person from this location jumped the fence into Spencer's yard to assist in subduing victim Spencer. On line records identifies one of the residents of this location as Carolina Sanchez Solis. We have yet to verify this information.

On  04-23-2018 I  Witness 3 below. Witnesses informed me that the incident took place during the 3 or 4 o'clock ours on 02-23-2014. Further that Sheriff department during 7PM o'clock hours took all 7 persons jointly in a van to sheriff department returning them their homes at 4AM the following morning.

I am informed 7 persons were taken to Sheriff Department offices to be interviewed. Please find below my interview summary notes for 3 of these persons below pending a more detailed report

### I.    List of Potential Witnesses

1. **Witness 1:** Donald (DJ) Hougen Jr.  age 15
a. DOB: 02-26-2003
b. Contact info: Stays with Grandmother  40784 176th Street East Palmdale 93591 Phone: (626) 472-8496
c. Interview Date: 4-15-2018
d. Taken to sheriff station 02-23-2018 to make statement
2. **Witness 2:** Dona Hougen Mother of Witness 3 and grandmother of witness 1
a. DOB: 01-02-1951
b. Contact Info: Contact info: Stays with Grandmother  40784 176th Street East Palmdale 93591 Phone: (626) 472-8496
c. Interview date 4-15-18
d. Taken to sheriff station 02-23-2018 to make statement

3. **Witness 3:** Donald Hougen father of witness 1 and son of Witness 2 Care taker for Victim Jeremy Spencer Home 40192 176th Street East Palmdale
   a. DOB: 07-08-1962
   b. Contact Info: 40183 Ridgemist Street, Palmdale CA 93951 Phone (661) 470-6648
   c. Interview date: 4-23-18 via phone
   d. Taken to sheriff station, 20-23-2018  to give statement

4. **Witness 4 :** Sebastian further name unknown age 11 years friend of Witness No. 1 Don Hougen Jr. was in back yard of home 40106 176th St East at time of incident
   a. Was not at location at time of my interview
   b. Residence of home male and female refused to give information as to their names and that of names of people at their home at time and date of incident 2-23-18
   c. Taken to sheriff station, 02-23-2018,  to give statement

5. **Witness 5:** Alex last name unknown. Younger cousin of Sebastian. Was in yard also with Witness No. 1 adjacent yard to incident. His father is reported to have assisted first intervening deputy sheriff who entered yard and encounter victim, Spencer.

6. **Witness 6: Alex' (**Witness 5**) father**  last name unknown father . Relative of residents at 40206 176th Street East. Witness 1 and 2 reported he jumped over fence to assist lone sheriff deputy who was reported struggling with victim
   a. Residents of 40206 declined to give information as to names or contact
   b. Taken to sheriff station, 02-23-2018

7. **Witness 7: Sebastian's mother identity unknown**
   a. Residents of 40206 176th Street East declined to give her identify.
   b. Taken to sheriff station, 02-23-2018  to give statement

**II. Summary of Witness Statements:**

☐ **5. Did witness observe incident prior to Sheriff deputies entering yard or jumping over fence**

➢ **Witness 1** said he was *50 feet away* in adjacent yard 40206 and observed victim Spencer speaking with Witness 6 (father of boy named Alex). Witness said there was no problem

➢ **Witness 1** says he saw a single deputy running towards Jeremy and that this deputy entered from the south side of Jeremy's residence. Witness 1 said he knew the gate on that side of residence had not been locked prior to the arrival of the single deputy.

➢ **Witness 2** said she also observed this but also had previously been asked by Sheriff's to call them if she saw victim Spencer. She did so. Witness 1 also said in her previous contacts with Sheriff they informed her they were seeking to take victim Spencer for mental health treatment. Witness 2 also confirms Witness 1 statement concerning the un-locked side gate on south side of residence.

➢ Witnesses 1 and 2 stated it was sometime within in several minutes that 2 to 3 other deputies arrived jumping over a locked gate on the north side of Jeremy residence to assist the lone deputy and neighbor who was assisting that deputy.

➢ Witness 2 and 3 state that on the prior day a swat team of deputies had come to Jeremy residence to take him to mental health facility. But after some hours departed as Jeremy had refused to come out to surrender to them.

➢ Witnesses 2 and 3 state Sheriff deputies assured them they did not plan to kill or hurt Jeremy but were taking extra precautions and help from mental health team to take Jeremy to mental health care.

☐ 6. Did witness video incident or know who may

➢ **Witness 3** states he saw someone who thinks did so but will investigate further and call us if he finds the person

☐ **7. Did witness see struggle with Sheriff Deputies**

☐ **a. Observe if they handcuffed Jeremy**

---

➢ **Witness 1** state that he saw a single deputy with assistance of Witness 6 attempt to handcuff Jeremy. He states soon there after several more deputies arrived jumping over a gate to assist in handcuffing Jeremy.

➢ **Witness 2** Also confirms Witness 1 statements. Witness was approximately ***200 feet away in her yard*** looking over her fence.

➢ **Witness 3** states he saw Jeremy hogties and that at some point at least 25 deputies had arrived on scene after he arrived

☐ **b. Observed if they tied (hogtied) Jeremy  up**

  ➢ **Witness 1** states he did not observe that

  ➢ **Witness 2** said she thinks that is what happens but was turning her head away to the brutal beating she said deputies were giving Jeremy.

  ➢ **Witness 3** said when he arrived, from his home,  within his 2 minutes of  a call from Witness 2 (his mother) he saw deputies putting straps on Jeremy from his hand cuffs on his hand to the ones on his feet.

  ➢ **Witness 2** states he thinks the cuff's on his angle area  were over his pants.

☐ **c. Observed if they tasered Jeremy**

  ➢ **Witness 1 and 2** said they saw the deputies who arrived shortly after the 1st deputies use a taser and flashlights hitting Jeremy on his body.

  ➢ **Witness 3** upon his arrival did not see use of taser.

☐ **d. Heard any conversation or words said by Jeremy during struggle.**

  ➢ **Each of the 3 witness agree they heard Jeremy state:**
    1. Why are you doing this I am not doing anything
    2. You are hurting me

---

3. **Witness 3** states Jeremy was not struggling anymore as he was telling deputies they were hurting him
4. **Witness 3** states deputies continued to holler at Jeremy and assault him telling him to be still.

☐ **e. Observed if they tried to give medical aide**
  ➢ **Witness 1 and 2** state after Jeremy stopped moving deputies then un-cuffed Jeremy and began CPR
  ➢ **Witness 3** however was 5 feet away from Jeremy states the following:
   1. Deputies had ordered him away and go back to gate area (east gate closes to incident0
   2. They deputies did not seem to be doing aggressive job of doing CPR
   3. When ambulance arrived at first they had left keys in vehicle and had to go get them to open back door area of vehicle.
   4. Witness 1 was person who broke lock on east side gate to let medical personnel in to yard
   5. Paramedics from fire department when they arrived appeared to witness 3 not to take quick or any real action to attempt to revive or give CPR to Jeremy.

☐ **8. Did witness observe any prior contacts between Sheriff Dep. and Jeremy**
  ➢ **Witness 2 and 3** said they observed deputies frequently in days and months before attempt to talk to and make contact with Jeremy. That also on day before Swat team attempted to get Jeremy to come out so they could take him to custody of which deputies said they were talking him for mental health treatment.
  ➢ **Witnesses 2 and 3** state deputies said they had special teams for that purpose and they did not intent to kill or hurt Jeremy but get him help. Witness also said deputies had been patrolling area after the swat team attempt to take Jeremy on 2-22-2018

**9. How did Jeremy describe or say anything about Deputies (his framework of mind)** Taken to sheriff station, 20-23-2018 to give statement

➤ **Witness 2 and 3** clearly state that Jeremy's mental health deteriorated during the last 2 months period.
1.  That Jeremy believed that aliens had taken his make believe wife to a park in Palmdale and hiding her in a clocked space ship. He called these aliens genies
2.  In order to ward off genies he put the heads of chickens and water bottles with food all around his house That deputies well were aware of this and the display was still around the house on 02-23-2018 the date of Jeremy death.
3.  Those deputies had known and aware of the above as convey to them by Witnesses 2 and 3 and others.
4.  Witnesses also state that Jeremy cleanly believed that the Sheriff Deputies where the genies he feared. But were not sure if Deputies knew that Jeremy considered them as the genies.
5.

<u>Supplemental Notes:</u>

I am in the process of attempting to ID the residences, 40206 176th Street East and their relatives who were present and interviewed by <u>Sheriff Investigators</u> on the date of the incident.

I will forward the pictures and other documents I have collected.

Finally it is note worthy  to point out the of the 7 break ins and taking of property and Jeremy's car after the 2-23-2081 incident Deputies according to Witnesses 2 and 3 have refused to take reports from them or help secure the property. O21m 2018 on or about 4/22/2018 Witness 3, Donald Hougen said he went to Sheriff Substation to report a break in and name of

person who did so. Deputies refused to take his report saying he was not the home owner. Hougen is the property manager by contract.

Thank you for your assignment in this matter,

Michael D. Howard

# EXHIBIT 5

# Marvin Pietruszka, M.D., J.D., F.C.A.P.
Board Certified Anatomic and Clinical Pathology
19234 Vanowen Street - Reseda, CA 91335
(818) 705-1157/Fax (818) 705-4273

---

## AUTOPSY – A18-03

| | |
|---|---|
| Name: | SPENCER, JEREMY |
| Date of Birth: | February 3, 1970 |
| Hospital: | 40192 176th Street |
| | Palmdale, CA 93591 |
| Date and Time of Death: | February 3, 2018  5:00 pm |
| Date and Time of Autopsy: | April 22, 2018  3:00 pm |
| Place of Autopsy: | Forensic Autopsy Services |
| | 19234 Vanowen Street |
| | Reseda, CA 91335 |
| Prosector: | Marvin Pietruszka, M.D., J.D., F.C.A.P. |
| Assistant: | Jason Major |

## FINAL ANATOMIC DIAGNOSES

I. **CARDIORESPIRATORY ARREST SECONDARY TO RESTRAINT OF ASPHYXIA**
II. **BILATERAL PULMONARY EDEMA**
III. **MULTIPLE BILATERAL RIB FRACTURES AND FRACTURE OF STERNUM, STATUS POST RESUSCITATION**
IV. **MULTIPLE CONTUSIONS INVOLVING THE HEAD, EXTREMITIES, BACK**
V. **STEATOSIS OF LIVER**
VI. **POSTMORTEM DECOMPOSITION, MODERATE**

## CLINICAL DIAGNOSES

I. **POSTTRAUMATIC STRESS DISORDER**
II. **DEPRESSION**
III. **HALLUCINATIONS/PARANOIA**
IV. **HEPATITIS C**
V. **HEPATIC STEATOSIS**

# EXHIBIT 6

## ( UNDER SEAL)

# EXHIBIT 7

## ( UNDER SEAL)

# EXHIBIT 8

**KEPHART CONSULTING, LLC**
Phoenix, Visalia, CA, & Miami
(602) 615-7694
stan@policeandsecuritypractices.com
www.policeandsecuritypractices.com

---

## DECLARATION

## Don Spencer vs. County of Los Angeles, Los Angeles County
## Sheriff's Department
## by
## Stanley L Kephart

I, Stan Kephart declare and state that I have personal knowledge of the facts of this case, and if called upon as a witness, could testify completely to the following:

**Qualifications:**

My opinions in this case are based on my formal education, applied science experience and my 39 plus years of combined line, middle management and executive law enforcement experience. (Exhibit #1)Upon completion of my master's degree in Secondary Education and my thesis which is on point with this case; *"Alternatives to lethal Force", a Defensive Tactics Educational Program within the San Jose Police Department.* As a result of my thesis and Department project in 1977, I was assigned by the Office of the Chief of Police to the position of San Jose, California Police Department's Lead Defensive Tactics Instructor for Advanced Individual Training (AIT). This assignment was made primarily due to my background in the martial arts and membership in the National Police Officers Defensive Tactics Association where I held office as a Regional Director.

Subsequent to obtaining my degree and after having taught in state mandated courses in both the Basic Peace Officer Course and Advanced Officer Courses certified by California Peace Officers Standards and Training (P.O.S.T.), I was appointed to the position of Academy Director at two of California's 48 P.O.S.T. certified academies. In that capacity, I authored P.O.S.T. performance objectives, substitute taught and managed the delivery of the above-mentioned courses.

In the early nineties a new phenomenon in law enforcement called positional restraint asphyxia emerged associated with a procedure officers called "hogtieing" of violent prisoners. This procedure was implemented by arresting officers and consisted of attaching a

1

hobble cord to the ankles of an arrestee and the other end was then secured to the handcuffs behind the arrestee's back.

According to medical research, this process restricted diaphragmic breathing of the prisoner during a time of oxygen debt attributed to the prisoner struggling with officers as was the case with Mr. Spencer resulting in breathing difficulty which creates a downward spiral of increased respiration and heart rate usually out of a combination of fear, panic or both resulting in first what clinicians refer to as a state of sudden tranquility followed by heart failure.

In response to user agency requests, P.O.S.T. academies were tasked to address this training issue with an appropriate training remedy. The topic of positional restraint asphyxia was discussed by the academy director's association and subsequently due to my background I researched and identified the Devane method using the hobble cord called the "Ripp" band. I then became a certified instructor in the Devane method and began instruction in all or my user agencies for both basic recruits and in-service officers training as an alternative to "Hogtieing." The Devane method subsequently became known as "Tarping" or the Total Appendage Restraint Procedure. This procedure consists of placement of the "Ripp band" around the front ankles of the prisoner, then attachment to the front of the handcuffs which was the policy of L.A.S.O. at the time of Mr. Spencer's Homicide. Clearly the difference between "Hogtieing" and Tarping the correct way was taught and known to the Deputies in this case as it was L.A.S.O. Policy and clearly arresting Deputies not only violated their policy and training but also mischaracterized what they did by referring to it as hobbling, which it was not. First evidence of the willful knowledge of the intentional violation of policy his agency's policy exists in statements made to investigators by Senior Deputy Lake who told Deputy Mendez who had control of the "Hogtied "Mr. Spencer at the scene, "Aren't you going to turn him (Spencer)on his side," (a recovery position to breathe better) whereupon Deputy Mendez responded, No we are not going to do that. "We are going to wait for the Sergeant who is close by." Here we have ineffective bystandership on the part of Deputy Lake who outranked Deputy Mendez and should have insisted on ventilating Mr. Spencer but did not, and Deputy Mendez who willfully violated policy by refusing to ventilate position Mr. Spencer.

As a California Undersheriff, a member of the State Sheriffs' Association and an active member of "Second in Command" in Committee, I assisted in developing model policies for adoption in use of force and prisoner restraint and transportation in committees, as well as in my own department while a member of the State Sheriffs Association.

As a Chief of Police in two states, California, and Arizona, as the appointing authority, I was required to review all use of force reports that were submitted through our chain of command submitted to my office as the appointing authority for final disposition. In that capacity, I have reviewed countless police use of force cases, both as a California Undersheriff, Chief of Police, and additionally during my service as a Court qualified expert witness in State, Federal and Tribal Court. During my time as an expert witness in police use of forcecases, my case distribution has remained 60% defense and 40% plaintiffs.

2

**Additional Qualifications for this Case:**

Since 1995 when the National Institute of Justice (an agency of the United States Department of Justice) published standards for preventing in-custody positional asphyxia cases including the New York City Police Department Policy to "never tie the handcuffs to a leg or ankle restraint" that has been the "Tactical Standard of Care." Factually, since the inception of the Devane (Ripp Restraint devices) there has been no tactical justification to hogtie which is why this antiquated methodology has been prohibited in many law enforcement agencies including L.A.S.O. 21 months after L.A.P.D. lost a wrongful death suit for $750,000 hogtieing a suspect Mr. Dwayne Nelson who died of positional restraint asphyxia, L.A.S.O changed their Total Appendage Restraint (TARP) procedure to restrain violent suspects by tying them up in a sitting position. This policy was clearly violated in this case.

I intend to offer in this case opinions, to include without limitation the responding Deputies' failure to adhere to the policies of their own agency against hogtieing, the use of existing resources that they are required to be aware of within their Department, including the L.A. County Sheriff's Department Met team for high risk violent persons and their training from the California Basic Peace Officers Course (P.O.S.T.) and Advanced Training certified by P.O.S.T

**Overview of Opinions:**

Based on previous calls for service to Mr. Spencer's home, in addition to his neighbor's familiarity with his service-connected condition (PTSD) and his erratic behavior, the first two responding Deputies in this case knew of Mr. Spencer's condition before making a stealth contact according to a witness running up from behind on Mr. Spencer and attempting to handcuff him, while he was in his own backyard conversing with a neighbor. Additionally, this warrantless search and seizure was conducted without backup present all of which is inconsistent with training certified by California P.O.S.T. in both the basic peace officer course and advanced officer training.

Factually, there was no exigent circumstance that required this surprise contact from behind on an obviously unstable individual, which constructively created an altercation that was not necessary, since he was in his own backyard and not a threat to anyone and had violated no law in the deputy's presence..

Mr. Spencer's relatively harmless bizarre condition was known to his neighbors and the L.A.S.O., and it is uncontested that there was moment and opportunity to continue to surveil the Spencer residence and to employ the training the Deputies had received regarding a person in Mr. Spencer's condition using their available resources.

All County law enforcement have been made aware of and are required to use mental health resources at their disposal. There can be no dispute as to the existence of these resources and

3

when to use them in this case, as they reside in the L.A.S.O. Department, and these Deputies were obligated by their training to contact the L.A. County Mental Health Psychiatric Mobile Response Team (PMRT) and knowingly disregarded this option or carelessly and recklessly dismissed the use of this trained unit's existence in favor of a surprise approach to a man on his own property,who was not violating the law at the time, and not arrestable without a warrant which Mr. Spencer told the deputies at one point in the altercation.

The first responding Deputies were culpable in this homicide (death at the hands of another) by not using the above described PMRT or the L.A. County Sheriff's Department Mental Health Evaluation Team (MET) who are trained and equipped to deal with violent or high-risk individuals. Factually, 2 days before this homicide deputies responded with the MET team and Mr. Spencer ran inside his house and refused to come out, so deputies left the area with no harm to either the deputies or Mr. Spencer.


**Basis for Opinions:**

1. Based on the discovery provided to plaintiff's counsel by the defendant's counsel, it appears that the deputies who responded were out of their reporting district, and self-initiated a stake out of Jeremy Spencer's home for two hours with no radio contact. It is unknown if the deputy's supervisor cleared this unusual patrol activity.

2. After seeing Jeremy Spencer talking to a neighbor, in his own backyard, two deputies approached Jeremy Spencer, one from behind,illegally coming onto private property with neither a search nor arrest warrant.

3. ***Source: Officer safety Info only pages 527 and 528 February 2, 2018.*** One day before the homicide of Jeremy Spencer, that Deputies Mendez and Alejandre played a critical role in the events that led up to the homicide of Jeremy Spencer. Deputies Mendez, Deputy Alejandre and Deputy Witty attempted to contact Jeremy Spencer at his home. Upon seeing Deputies, Mr. Spencer ran from his front yard inside his house. Subsequently, a perimeter was set up, then a command post, and a MET team was summoned. After repeated PA announcements for Mr. Spencer to come out which failed, deputies decided to not approach the residence and not to force entry, whereupon containment was broken, and a report was taken, and the deputies left, which was proper procedure.
   Absent a warrant, this same activity became the template for what should have been done in this case two days later under similar circumstances when Mr. Spencer was in his backyard, and Deputies conducted a warrantless surprise from behind attack on Mr. Spencer.

4. ***Source: Investigative Memorandum Michael D. Howard April 24, 2018.*** Witness Donald Hougen Sr.'s interview states that Jeremy was being hogtied.

5. ***Source:***Witness Dona Hougen,mother to Donald Hougen Sr, states Deputies tazed and hit Jeremy with fists and flashlights, both before and after he was subdued.

6. ***Source:*** Witness Donald Hougen Sr. states he saw upon his arrival Deputies pinning Jeremy with their knees into his head and neck area and back and hitting him in the same locations of the body.

7. ***Source:*** Witness Donald Hougen Sr. states Jeremy was at one point not struggling with Deputies, although they continued to hit Jeremy.

8. ***Source:*** Witness Donald Hougen Jr. states he saw a single Deputy running towards Jeremy, and that this Deputy entered from the south side of Jeremy's residence. Note: Had to have run up to Jeremy from behind.

9. ***Source:*** Witnesses Dona Hougen and Donald Hougen Jr. stated that on the day prior, a Swat Team came to take Jeremy to a Mental Health Facility, but Jeremy would not come out, so they departed.

10. ***Source:*** Witness Dona Hougen states she thinks that Jeremy was hogtied, but she turned her head away to the brutal beating Deputies were giving Jeremy.

11. ***Source:*** Witnesses Donald Hougen Jr. and Dona Hougen state they saw Deputies who arrived after the first Deputies use a taser and a flashlight hitting Jeremy on his body.

12. ***Source:*** Deposition testimony of Witness Segio Fabrias pages 56-57. Witness testified that the "short" deputy kicked and tased Jeremy after he was cuffed.

13. ***Source:*** Witnesses Donald Hougen Sr, Don Hougen and Donald Hougen Jr all state they heard Jeremy state, "Why are you doing this to me?" and, "You are hurting me, I can't breathe."

14. ***Source:*** Witnesses Dona Hougen and Donald Hougen Sr. state Deputies (two days prior) OR ONE??who were special teams did not intend to kill or hurt Jeremy but get him help.

15. ***Source:*** Page 354 Martindale interview with Deputy Mendez, lines 18–21 states, "I said go ahead and Tarp him." ***"Uhm, I gave the order to Tarp." "Uhm Deputy Ament, still having the hobble in his hand from when he applied it, applied the Tarp."*** "At that point, I believe—shortly after that, the first Palmdale Units arrived at our location." Note Deputy Mendez, a Field Training Officer, refers to the hogtieing of Jeremy Spencer as Tarping, which it is not and clearly, as a Field Training Officer, he knows and should be teaching the difference.

16. ***Source:*** Page 22-24 of 39 Investigator's Note: Describes "Total Appendage Restraint" correctly; however, this was not a Tarping, it was a hogtieing of Jeremy Spencer, and the investigator either knew this fact and falsely reported it or committed a grossly negligent investigation attempting to color the action, behavior and conduct of Deputy Mendez who ordered the hogtieing of Jeremy Spencer and supervised it being done followed by his ***(Source page190 Deputy lane interview)*** being advised by Sr. Deputy Lane to place Jeremy on his side per L.A.S.O. Policy, which he, Mendez, refused to do, even though this was not his arrest. Note: Deputy Mendez by his own admission gave the order to TARP and was present when the Tarping (which he referred to as hobbling, which, in fact, was hogtieing specifically against L.A.S.O. Policy) was implemented. Additionally, Deputy Mendez who was not the arresting Deputy, when confronted by Senior Deputy Lane seeing Mr. Spencer on his stomach asked Deputy Mendez, if he was going to turn Spencer on his side as per policy, Mendez replied "No we are not going to do that, the Sgt will be here soon." Note: Deputy Mendez who is a Field Training Officer knowingly

violated L.A.S.O.Policy directing the hogtieing of Mr. Spencer, then failed to follow a Senior Deputies' suggestion to turn Mr. Spencer on his side, so he could breathe, another violation of Department Policy culminating in the death of Mr. Spencer.

17. **_Source:_** Page 493 of the Autopsy Report states the cause of death was cardiopulmonary arrest during law enforcement restraint following physical altercation with conductive electrical device use, etiology not established at autopsy.

18. **_Source:_** Page 497 Autopsy Report superficial abrasions and contusions anterior 29 sites on diagram.

19. **_Source:_** Page 498 Autopsy Report substantial blunt force abrasions and contusions posterior 27 sites on diagram.

20. **_Source:_** Page 506 CT Scan Radiological Report "Origin of these fractures is uncertain but **_may be_** associated with attempted resuscitation.

21. **_Source:_** Page 16 Anatomic Summary, Multiple traumatic blunt force Trauma B multiple rib fractures, a fractured sternum.

22. **_Source:_** Page 29 No body camera or taser footage made available but were worn by deputies.

23. **_Source:_** Page 15 Reported impact of 6-8-inch Pelican flashlight

24. **_Source:_** Page 161 Detective Officer Safety Info from Detective Gore alerting Deputies that Mr. Spencer is arrestable for 422 P.C., a wobbler and was arrestable. **_Note: Mr. Spencer was arrestable on public property for 422 P.C. "threats," a wobbler which could be a felony or a misdemeanor but not on his own property, which Deputies are taught and trained from their basic training, requires a warrant under these circumstances. This is the reason the Deputies originally surveilled the house in the first instance thinking Mr. Spencer could come on public property. Finally, this had not yet been assigned to the Warrant Detail._**

25. **_Source:_** Page 186 Interview with Deputy Mendez who arrived after Mr. Spencer was handcuffed and hobbled with his hands behind his back lying on his stomach with Deputy Garay on his, Mr. Spencer's, back.

26. **_Source:_** Page 187 While not his arrest, Deputy Mendez instructs Deputy Ament, not his trainee, to TARP Mr. Spencer against L.A.S.O. Policy, as Ament secured the hobble cord behind Mr. Spencer's handcuffed back to the ankles with his legs touching his buttocks and on his stomach, a clear violation of policy known to all Field Training Officers like Deputy Mendez who must teach trainees Department policy.

27. **_Source:_** Page 190 Due to Spencer's combative demeanor, Deputies after Tarping, left Mr. Spencer on his stomach, violating L.A.S.O. Policy, standards of training and expectations of performance by a Field Training Officer. Note: Given training and policy of the Deputies, this was criminal negligence, since the condition of Mr. Spencer was noticed by Deputy Lane and not acted on by anyone.

28. **_Source:_** Page 190 **_Sr. Deputy Lane, a veteran of 28 years of service, was the on-scene Commander of this circumstance and reminded Deputy Mendez that he should turn Mr. Spencer on his side, whereupon Deputy Mendez stated, "No he was going to leave him as he was until the Sergeant who was close by arrived." Note: Deputy Lane failed_**

*his bystandership duty to enforce the turning of Mr. Spencer on his side by directing Mendez to do so making himself culpable.*

29. **_Source:_** Page 210 & 211 L.A.P.D. Sgt Goedeke reviewed the Taser download. **Note: Since this is evidence, why is it not available?**

30. **_Source:_** Page 518 lines 14-18 Interview of Deputy Mendez sees Mr. Spencer face down and states *"Deputy Ament was applying the proper technique, where he had his feet all the way up to his butt" Note: A clear violation of Tarping and an admission of what he, Deputy Mendez, ordered to be done.*

31. **_Source:_** Page 519 lines 18-21 Deputy Mendez states "I have had training in excited delirium." "He (Spencer) was trying to ruse us, to unhandcuff and untarp him, and he is going to freak out on us." Note: This statement confirms that Deputy Mendez knew the dangers associated with hogtieing and chose to ignore them falling far below the standard of care. Moreover, he, Mendez, as a Field Training Officer trains academy graduates regarding the critical dangers of hogtieing with an arrestee in a face down position.

32. **_Source:_** Page 192 paragraph 3 lines 6 &7 Deputy Pierson, Deputy Lane's partner and an EMT continued, and because he was an EMT took over CPR.  Pierson recalled seeing the suspect's hair in front of his mouth moving at one point and believed he was breathing.

33. **_Source: Deposition transcript of witness Sergio Fabrias:_** *Page 74-76,* Witness testified that Jeremy was still breathing when CPR was administered. The question is why? Both Jeremy's autopsy report and Dr. Peitruska's Forensic pathology report indicate that Jeremy suffered several broken ribs possibly caused by the administration of CPR. While possible this is highly unlikely as deputies are taught and trained and retrained at intervals how to administer first aid and CPR.

34. **_Source:_** Page 129, paragraph9 lines2 & 3Deputy Aguilar Report page 129 contacted Arianna Portillo and Devon Womak brother to Keliyah Nelson 10 yr. old female who complained about threats by Mr. Spencer.  Nothing seen by Arianna of significance.  Contacted Patrick Lydell whose child is Jerry Tate.  Nothing observed. Jerry Tate states he heard someone say, "I can't breathe" and someone say, "Shut the fuck up."

35. **_Source:_** Antelope Valley Hospital report, Page 1 of 6 Shows no name of patient, but based on investigation by Plaintiff's counsel, was determined to be Jeremy Spencer's report. No transport was made and no reason for lack of transport to the hospital was indicated, yet Jeremy was pronounced deceased by Dr. Hsieh without the Dr. physically seeing or monitoring Jeremy according to the police report page 171.

36. In my opinion, Deputy Mendezeither acted out of negligent incompetence or willful disregard. Either way, he had to be aware of the standards and dangers by his own admission.

37. As of the date of this report, no internal investigation report of findings and no District Attorney's report of findings from the Justice System Integrity Division has been produced. According to published online documents by the L.A. County District Attorney's Office such reports of investigations are required to be completed by law Enforcement within 60 to 90 days of the incident in question. The District Attorney's office is to complete their report within 60 days of receipt of the report from Law Enforcement. It has been two years and 2 months from the date of this incident on

7

February 3, 2018. Such a delay is unconscionable permitting deputies to continue to work in the community after they clearly have violated the policy and procedure causing a death due to either willful conduct or a training failure.

## Materials Reviewed

Obituary
Spencer – Complaint
Michael Howard & Associates Report
Spencer – LASD Sheriff's Article
Plaintiff's Request for Admissions, Set No. One
Plaintiff's Request for Production of Documents, Set No One
Plaintiff's Request for Interrogatories, Set No. One
LA County Sheriff's Dept. Employee Training Data Inquiry, discovery provided to Plaintiff's counsel.
Hospital both V.A. and Antelope Valley Psychologicaland Medical Records of Jeremy Spencer
Sheriff's Department Supplemental Report
Antelope Valley Hospital Base Hospital Form Report

Deposition Transcript of Sergio Fabrias
District Attorney's Protocol for Officer Involved Shootings and In Custody Deaths, latest edition.

I declare that the foregoing is true and correct. All my opinions are based on a reasonable degree of scientific probability. I reserve the right to change my opinions concerning this case, should I become aware of additional information, which I am not in possession of as presented

Executed on March 15, 2020 at Phoenix, Arizona

Stanley L. Kephart
2989 N. 44th St. #3028
Phoenix, AZ 85018
(602) 615-7694
Email: stan@policeandsecuritypractices.com
www.policeandsecuritypractices.com

8



# 3 DELTA CONSULTING, LLC

## SECURITY AND THREAT MITIGATION

7339 E Williams Dr, #27408 | Scottsdale, AZ 85255 | 651.402.8628
b.zapor@cox.net |

Mr. Stan Kephart
Principal
Kephart Consulting, LLC
2989 N. 44th St.. #3028
Phoenix, AZ  85018

**RE:** *Don Spencer vs. County of Los Angeles, Los Angeles County*

Mr. Kephart:

I have conducted a review of:

1. Tazer Evidence Sync Report: Tazer Model X26P, serial # X13004HVF

2. Proposed Manual Revision Los Angeles County Sheriff's Department:

   - 3-06/200.10 Inability to Activate Body Worn Camera Prior To Initiating Enforcement or Investigative Contact.

   - 3-06/200.13 Recording of The Entire Contact.

   - 3-06/200.15 Documentation Required for Failing to Activate Body Worn Camera or Recording the Duration of the Contact.

   - 3-06/200.18 Body Worn Camera Recording Exceptions.

3. DECLARATION *Don Spencer vs. County of Los Angeles, Los Angeles County Sheriff's Department* by Stanley L Kephart

In summary, I concur with the entirety of your findings. Of note:

1. The lack of (not provided by the Respondent) body camera data, video, or corroborating statements prevents exculpatory or conflicting information examination. LASD policy requires the activation of body camera for arrest actions. As the Deputies actions were proactive, the policy clause exempting activation of the body cam is not relevant here. Notwithstanding any other information, the lack of body camera data or video demonstrating activation of body cam before/during the actions taken on 2/3/18 are in violation of LASD policy (3-06/200.18 *Body Worn Camera Recording Exceptions*).

2. My review of the timeline use (Tazer Evidence Sync Report: Tazer Model X26P, serial # X13004HVF) of Tazer Model X26P, serial #X13004HVF is consistent with your evaluation. I am unable able to discern, of the total 22 seconds of active deployment, if there was a use of the Drive Stun technique or if cartridges were reloaded and deployed.

Please feel free to contact me with any questions.

Sincerely,

Bernard J. Zapor
President and CEO, 3 Delta Consulting, LLC
ATF Special Agent in Charge (Retired)

# EXHIBIT 9


CHRISTOPOULOS
Economics Consulting Group

# JAMES CHRISTOPOULOS J.D., M.A.

## Experience

| | |
|---|---|
| CHRISTOPOULOS ECONOMICS CONSULTING GROUP | August 2008 – Present |
| Principal | |

| | |
|---|---|
| JAMES CHRISTOPOULOS, ECONOMIST | March 2006 – August 2008 |
| Principal | |

| | |
|---|---|
| VAVOULIS & WEINER, LLC | March 2004 – February 2006 |
| Economic Consultant | |

| | |
|---|---|
| VAVOULIS & ASSOCIATES, INC. | October 1996 – March 2004 |
| Economic Consultant | |

## Education

Master of Arts, Economics: California State University, Fullerton, May 2001.
Juris Doctor: John Marshall School of Law, Chicago, Illinois, June 1995.
Bachelor of Arts, History: University of California, Los Angeles, March 1991.

## Publications

- M.A. Thesis: "Using Occupational Attainment Probabilities to Estimate Future Earnings for A Minor Child", CSUF Library, May 2001.
- "Personal and Indivisible Consumption and Support Factors", with Gerald Martin, Ph.D., Determining Economic Damages, (Chapter 5, Section 535), 2003, 2004.

## Professional Memberships

American Academy of Economic and Financial Experts
National Association of Forensic Economics
The State Bar of California


CHRISTOPOULOS
Economics Consulting Group

# Summary of Economic Damages Claimed by
# The Family of Jeremy Spencer

**Prepared April 21, 2020**
**\*\*\* Preliminary Report - Prepared for Mediation Purposes Only \*\*\***

|  | Living Alone | If Living with Wife |
|---|---|---|
| **Past Losses** | | |
| Loss of Support | $ 17,640 | $ 64,763 |
| Reduced for Personal Consumption | $ - | $ (35,555) |
| Loss of Household Services | $ 3,932 | $ 39,983 |
| **Total Past Loss** | **$ 21,572** | **$ 69,191** |
| **Future Losses** | | |
| Loss of Support | $ 3,343 | $ 415,806 |
| Reduced for Personal Consumption | $ - | $ (228,277) |
| Loss of Household Services | $ 8,009 | $ 280,034 |
| **Total Future Loss** | **$ 11,353** | **$ 467,562** |
| **Total Past and Future Loss** | **$ 32,925** | **$ 536,753** |



**CECG CHRISTOPOULOS**
Economics Consulting Group

*JEREMY DAMAGES FROM STATE CAUSES of ACTION*

# Summary of Economic Damages Claimed by
# Jeremy Spencer

**Prepared May 14, 2020**

**\*\*\* Preliminary Report - Prepared for Mediation Purposes Only \*\*\***

### Past Losses

| | | |
|---|---|---|
| Loss of VA Pension | $ | 64,763 |
| Loss of Household Services | $ | 34,896 |
| **Total Past Loss** | **$** | **99,658** |

### Future Losses

| | | |
|---|---|---|
| Loss of VA Pension | $ | 448,776 |
| Loss of Household Services | $ | 268,172 |
| **Total Future Loss** | **$** | **716,948** |

**Total Past and Future Loss**   **$ 816,606**

 **CHRISTOPOULOS** Economics Consulting Group    *RACHAEL*

## Past Loss of VA Pension

Basis:          $18,000     $1,500/mo. VA Pension [*Src: Plaintiffs' Questionnaire Responses*]
Growth:         2.8%        2019 COLA Increase [*Src: ssa.gov*]
Growth:         1.6%        2020 COLA Increase [*Src: ssa.gov*]

| Period: | From | To | Time (yrs) | Basis | Loss |
|---------|------|-----|-----------|-------|------|
| | 02/03/18 - 01/01/19 | | 0.91 | $18,000 | $16,380 |
| | 01/01/19 - 01/01/20 | | 1.00 | $18,504 | $18,504 |
| | 01/01/20 - 01/01/21 | | 1.00 | $18,800 | $18,800 |
| | 01/01/21 - 08/02/21 | | 0.58 | $19,101 | $11,079 |
| Total | | | 3.49 | | **$64,763** |

## Future Loss of VA Pension

Period:         28.56 yrs   DOV to Jeremy's LE
Basis:          $19,101     continued from the past
Net Discount:   1.4%        Avg Net Discount Rate 2010-19: 30yr Treasury; CPI-W
                            [*Src: FRB-stlouisfed.org; USDOT-treasury.gov; USDOL-bls.gov*]

| Period: | From | To | Time (yrs) | Present Value |
|---------|------|-----|-----------|---------------|
| | 08/02/21 - 01/01/22 | | 0.42 | $7,975 |
| | 01/01/22 - 01/01/23 | | 1.00 | $18,854 |
| | 01/01/23 - 01/01/24 | | 1.00 | $18,589 |
| | 01/01/24 - 01/01/25 | | 1.00 | $18,328 |
| | 01/01/25 - 01/01/26 | | 1.00 | $18,071 |
| | 01/01/26 - 01/01/27 | | 1.00 | $17,817 |
| | 01/01/27 - 01/01/28 | | 1.00 | $17,567 |
| | 01/01/28 - 01/01/29 | | 1.00 | $17,320 |
| | 01/01/29 - 01/01/30 | | 1.00 | $17,077 |
| | 01/01/30 - 01/01/31 | | 1.00 | $16,837 |
| | 01/01/31 - 01/01/32 | | 1.00 | $16,600 |
| | 01/01/32 - 01/01/33 | | 1.00 | $16,367 |
| | 01/01/33 - 01/01/34 | | 1.00 | $16,137 |
| | 01/01/34 - 01/01/35 | | 1.00 | $15,911 |
| | 01/01/35 - 01/01/36 | | 1.00 | $15,687 |
| | 01/01/36 - 01/01/37 | | 1.00 | $15,467 |
| | 01/01/37 - 01/01/38 | | 1.00 | $15,250 |
| | 01/01/38 - 01/01/39 | | 1.00 | $15,036 |
| | 01/01/39 - 01/01/40 | | 1.00 | $14,825 |
| | 01/01/40 - 01/01/41 | | 1.00 | $14,616 |
| | 01/01/41 - 01/01/42 | | 1.00 | $14,411 |
| | 01/01/42 - 01/01/43 | | 1.00 | $14,209 |
| | 01/01/43 - 01/01/44 | | 1.00 | $14,009 |
| | 01/01/44 - 01/01/45 | | 1.00 | $13,812 |
| | 01/01/45 - 01/01/46 | | 1.00 | $13,618 |
| | 01/01/46 - 01/01/47 | | 1.00 | $13,427 |
| | 01/01/47 - 01/01/48 | | 1.00 | $13,239 |
| | 01/01/48 - 01/01/49 | | 1.00 | $13,053 |
| | 01/01/49 - 01/01/50 | | 1.00 | $12,869 |
| | 01/01/50 - 02/22/50 | | 0.14 | $1,798 |
| Total | | | 28.56 | **$448,776** |

*Don Spencer v. County of Los Angeles [1477]*

 **CHRISTOPOULOS**
Economics Consulting Group

DRENEA

## Past Loss of Support - Drenea's Auto Payment

Basis:          $5,040     $420/mo car payment to Ally Auto, 2016 Kia Soul Plus [ *Src: Drenea Spencer Singer* ]

| Period: | From | To | Time (yrs) | No. of Payments | Basis | Loss |
|---------|------|----|-----------|----------------|-------|------|
| | 02/03/18 | - 02/28/18 | 0.07 | 1 | $5,040 | $0 |
| | 03/01/18 | - 08/02/21 | 3.42 | 42 | $5,040 | $17,640 |
| Total | | | 3.49 | | | $17,640 |

## Future Loss of Support - Drenea's Auto Payment

Period:          0.74 yrs     DOV to Loan Termination
Basis:           $5,040       continued from the past
Discount Rate:   1.2%         30-year Treasury Yield, as of 04/20/2020 [ *Src: treasury.gov* ]

| Period: | From | To | Time (yrs) | No. of Payments | Present Value |
|---------|------|----|-----------|----------------|---------------|
| | 08/02/21 | - 08/31/21 | 0.08 | 1 | $0 |
| | 08/31/21 | - 04/30/22 | 0.66 | 8 | $3,343 |
| Total | | | 0.74 | | $3,343 |

 

## Past Loss Of Household Services - Living Alone

| | | | | | | |
|---|---|---|---|---|---|---|
| Basis: | $8,314 | | Single Men, Disabled & Unable to Work, No Minor Children, Ages 45-54, Less Personal Consumption |
| | | | [*Src: "The Dollar Value of a Day, 2018 Valuation," Expectancy Data* ] |
| Use/Consumption %: | 13% | | Reduce Above Basis to 8 hours/2 weeks, to account for visitation [ *Src: Don Spencer* ] |
| Growth: | 3.9% | | Average annual increase ECI: Private Industry, Service Occupations, 2018-19 [*Src: USDOL bls.gov* ] |

| Period: | From | To | Time (yrs) | Basis | Loss | Reduced Loss |
|---|---|---|---|---|---|---|
| | 02/03/18 | - 01/01/19 | 0.91 | $8,314 | $7,566 | $990 |
| | 01/01/19 | - 01/01/20 | 1.00 | $8,474 | $8,474 | $1,108 |
| | 01/01/20 | - 01/01/21 | 1.00 | $8,803 | $8,803 | $1,151 |
| | 01/01/21 | - 08/02/21 | 0.58 | $9,000 | $5,220 | $683 |
| Total | | | 3.49 | | | **$3,932** |

## Future Loss of Household Services - Living Alone

| | | | |
|---|---|---|---|
| Period: | 7.26 yrs | | DOV to Don's LE |
| Basis: | $9,000 | | continued from the past |
| Basis: | $8,422 | | Single Men, Disabled & Unable to Work, No Minor Children, Ages 55+, Less Personal Consumption |
| | | | [*Src: "The Dollar Value of a Day, 2018 Valuation," Expectancy Data* ] |
| Use/Consumption %: | 13% | | Reduce Above Basis to 8 hours/2 weeks, to account for visitation [ *Src: Don Spencer* ] |
| Net Discount: | 0.9% | | Avg Net Discount Rate 2010-19: 30yr Treasury; ECI: Private Industry, Service Occupations |
| | | | [*Src: FRB-stlouisfed.org; USDOT-treasury.gov; USDOL-bls.gov* ] |

| Period: | From | To | Time (yrs) | Present Value | Reduced Loss | |
|---|---|---|---|---|---|---|
| | 08/02/21 | - 08/02/22 | 1.00 | $8,960 | $1,172 | |
| | 08/02/22 | - 08/02/23 | 1.00 | $8,881 | $1,162 | |
| | 08/02/23 | - 08/02/24 | 1.00 | $8,803 | $1,151 | |
| | 08/02/24 | - **02/02/25** | 0.51 | $4,469 | $585 | *Age 55* |
| | 02/02/25 | - 02/02/26 | 1.00 | $8,128 | $1,063 | |
| | 02/02/26 | - 02/02/27 | 1.00 | $8,056 | $1,054 | |
| | 02/02/27 | - 02/02/28 | 1.00 | $7,985 | $1,045 | |
| | 02/02/28 | - 11/01/28 | 0.75 | $5,949 | $778 | |
| Total | | | 7.26 | **$61,233** | **$8,009** | |


**CHRISTOPOULOS**
Economics Consulting Group

*NA*

## Past Loss of Support - If Living with Wife

| Basis: | $18,000 | $1,500/mo. VA Pension [ *Src: Plaintiffs' Questionnaire Responses* ] |
|---|---|---|
| Use/Consumption %: | 55% | Decedent's Personal Consumption as a % of Basis [ *SRC: Determining Economic Damages, Rev.27, Table* |
| Growth: | 2.8% | 2019 COLA Increase [ *Src: ssa.gov* ] |
| Growth: | 1.6% | 2020 COLA Increase [ *Src: ssa.gov* ] |

| Period: | From | To | Time (yrs) | Basis | Loss |
|---|---|---|---|---|---|
| | 02/03/18 | 01/01/19 | 0.91 | $18,000 | $16,380 |
| | 01/01/19 | 01/01/20 | 1.00 | $18,504 | $18,504 |
| | 01/01/20 | 01/01/21 | 1.00 | $18,800 | $18,800 |
| | 01/01/21 | 08/02/21 | 0.58 | $19,101 | $11,079 |
| Total | | | 3.49 | | $64,763 |

## Future Loss of Support - If Living with Wife

| Period: | 26.02 yrs | DOV to Rachael's LE |
|---|---|---|
| Basis: | $19,101 | continued from the past |
| Use/Consumption %: | 55% | Decedent's Personal Consumption as a % of Basis [ *SRC: Determining Economic Damages, Rev.27, Table* |
| Net Discount: | 1.4% | Avg Net Discount Rate 2010-19: 30yr Treasury; CPI-W |
| | | [ *Src: FRB-stlouisfed.org; USDOT-treasury.gov; USDOL-bls.gov* ] |

*RACHEL IF SHE GOT BACK WITH JEREMY*

| Period: | From | To | Time (yrs) | Present Value |
|---|---|---|---|---|
| | 08/02/21 | 01/01/22 | 0.42 | $7,975 |
| | 01/01/22 | 01/01/23 | 1.00 | $18,854 |
| | 01/01/23 | 01/01/24 | 1.00 | $18,589 |
| | 01/01/24 | 01/01/25 | 1.00 | $18,328 |
| | 01/01/25 | 01/01/26 | 1.00 | $18,071 |
| | 01/01/26 | 01/01/27 | 1.00 | $17,817 |
| | 01/01/27 | 01/01/28 | 1.00 | $17,567 |
| | 01/01/28 | 01/01/29 | 1.00 | $17,320 |
| | 01/01/29 | 01/01/30 | 1.00 | $17,077 |
| | 01/01/30 | 01/01/31 | 1.00 | $16,837 |
| | 01/01/31 | 01/01/32 | 1.00 | $16,600 |
| | 01/01/32 | 01/01/33 | 1.00 | $16,367 |
| | 01/01/33 | 01/01/34 | 1.00 | $16,137 |
| | 01/01/34 | 01/01/35 | 1.00 | $15,911 |
| | 01/01/35 | 01/01/36 | 1.00 | $15,687 |
| | 01/01/36 | 01/01/37 | 1.00 | $15,467 |
| | 01/01/37 | 01/01/38 | 1.00 | $15,250 |
| | 01/01/38 | 01/01/39 | 1.00 | $15,036 |
| | 01/01/39 | 01/01/40 | 1.00 | $14,825 |
| | 01/01/40 | 01/01/41 | 1.00 | $14,616 |
| | 01/01/41 | 01/01/42 | 1.00 | $14,411 |
| | 01/01/42 | 01/01/43 | 1.00 | $14,209 |
| | 01/01/43 | 01/01/44 | 1.00 | $14,009 |
| | 01/01/44 | 01/01/45 | 1.00 | $13,812 |
| | 01/01/45 | 01/01/46 | 1.00 | $13,618 |
| | 01/01/46 | 01/01/47 | 1.00 | $13,427 |
| | 01/01/47 | 08/09/47 | 0.60 | $7,988 |
| Total | | | 26.02 | $415,806 |

 

## Past Loss Of Household Services

| Basis: | $9,651 | Single Men, Disabled & Unable to Work, No Minor Children, Ages 45-54 |
|--------|--------|------------------------------------------------------------------|
| | | [*Src: "The Dollar Value of a Day, 2018 Valuation," Expectancy Data*] |
| Use/Consumption %: | 100% | No Reduction in Above Basis |
| Growth: | 3.9% | Average annual increase ECI: Private Industry, Service Occupations, 2018-19 [*Src: USDOL bls.gov*] |

| Period: | From | To | Time (yrs) | Basis | Loss |
|---------|------|-----|-----------|-------|------|
| | 02/03/18 - 01/01/19 | | 0.91 | $9,651 | $8,782 |
| | 01/01/19 - 01/01/20 | | 1.00 | $9,836 | $9,836 |
| | 01/01/20 - 01/01/21 | | 1.00 | $10,218 | $10,218 |
| | 01/01/21 - 08/02/21 | | 0.58 | $10,447 | $6,059 |
| Total | | | 3.49 | | **$34,896** |

## Future Loss of Household Services

| Period: | 28.57 yrs | DOV to Jeremy's LE |
|---------|-----------|-------------------|
| Basis: | $10,447 | continued from the past |
| Basis: | $10,652 | Single Men, Disabled & Unable to Work, No Minor Children, Ages 55+ |
| | | [*Src: "The Dollar Value of a Day, 2018 Valuation," Expectancy Data*] |
| Use/Consumption %: | 100% | No Reduction in Above Basis |
| Net Discount: | 0.9% | Avg Net Discount Rate 2010-19: 30yr Treasury; ECI: Private Industry, Service Occupations |
| | | [*Src: FRB-stlouisfed.org; USDOT-treasury.gov; USDOL-bls.gov*] |

| Period: | From | To | Time (yrs) | Present Value | |
|---------|------|-----|-----------|---------------|---|
| | 08/02/21 - 08/02/22 | | 1.00 | $10,401 | |
| | 08/02/22 - 08/02/23 | | 1.00 | $10,309 | |
| | 08/02/23 - 08/02/24 | | 1.00 | $10,218 | |
| | 08/02/24 - **02/02/25** | | 0.51 | $5,188 | *Age 55* |
| | 02/02/25 - 02/02/26 | | 1.00 | $10,280 | |
| | 02/02/26 - 02/02/27 | | 1.00 | $10,190 | |
| | 02/02/27 - 02/02/28 | | 1.00 | $10,100 | |
| | 02/02/28 - 02/02/29 | | 1.00 | $10,011 | |
| | 02/02/29 - 02/02/30 | | 1.00 | $9,922 | |
| | 02/02/30 - 02/02/31 | | 1.00 | $9,835 | |
| | 02/02/31 - 02/02/32 | | 1.00 | $9,748 | |
| | 02/02/32 - 02/02/33 | | 1.00 | $9,662 | |
| | 02/02/33 - 02/02/34 | | 1.00 | $9,577 | |
| | 02/02/34 - 02/02/35 | | 1.00 | $9,492 | |
| | 02/02/35 - 02/02/36 | | 1.00 | $9,409 | |
| | 02/02/36 - 02/02/37 | | 1.00 | $9,326 | |
| | 02/02/37 - 02/02/38 | | 1.00 | $9,243 | |
| | 02/02/38 - 02/02/39 | | 1.00 | $9,162 | |
| | 02/02/39 - 02/02/40 | | 1.00 | $9,081 | |
| | 02/02/40 - 02/02/41 | | 1.00 | $9,001 | |
| | 02/02/41 - 02/02/42 | | 1.00 | $8,922 | |
| | 02/02/42 - 02/02/43 | | 1.00 | $8,843 | |
| | 02/02/43 - 02/02/44 | | 1.00 | $8,765 | |
| | 02/02/44 - 02/02/45 | | 1.00 | $8,688 | |
| | 02/02/45 - 02/02/46 | | 1.00 | $8,611 | |
| | 02/02/46 - 02/02/47 | | 1.00 | $8,535 | |
| | 02/02/47 - 02/02/48 | | 1.00 | $8,460 | |